UNITED STATES of America,
Plaintiff–Appellant,

v.

Alvin Debois TURNER, Defendant–
Appellee.

UNITED STATES of America,
Plaintiff–Appellant,

v.

William Earl JONES;  Michael Joel
Davis, Defendants–Appellees.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Frederick BANKS, Defendant–Appellee.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Ronald Wayne JOHNSON, aka Easy
aka Heedy, Defendant–Appellee.

Nos. 95–50494, 95–50496, 95–
50528 and 95–50550.

United States Court of Appeals,
Ninth Circuit.

Argued Feb. 7, 1996.

Submission Deferred Feb. 7, 1996.

Submitted July 29, 1996.

Decided Jan. 16, 1997.

Richard E. Drooyan, Miriam A. Krinsky, George S. Cardona, Elizabeth R. Abrams, Assistant United States Attorneys, Los Angeles, CA, for plaintiff-appellant.

Hector C. Perez, San Diego, CA, for defendant-appellee Alvin Debois Turner.

Dean R. Gits, Overland & Gits, Santa Monica, CA, for defendant-appellee Michael Joel Davis.

Michael J. Treman, Santa Barbara, CA, for defendant-appellee Frederick Banks.

Errol H. Stambler, Los Angeles, CA, for defendant-appellee Ronald Wayne Johnson.

Dwight B. Moore, Los Angeles, CA, for defendant-appellee William Earl Jones.

Before: BEEZER, BRUNETTI, and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

The government appeals the district court's dismissal of the indictments of five defendants charged with the distribution of crack cocaine—dismissals imposed as sanctions for failure to comply with the district court's discovery orders after the defendants had alleged that they were being selectively prosecuted on the basis of their race. Guided by *United States v. Armstrong*, 48 F.3d 1508 (9th Cir.1995) (en banc), the district court found that the defendants had made a sufficient showing of selective prosecution to justify their requests for discovery. We de-ferred decision on the government's appeal after certiorari had been granted in *Armstrong*, and after the Supreme Court had decided *Armstrong* we invited and received additional briefing by the parties.

These cases are not identical with *Armstrong*, but, as always, the law develops by the concrete application of principles, here authoritatively set out in *United States v. Armstrong*, —— U.S. ——, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). In its light, we hold that the district court abused its discretion. The indictments must be reinstated.

## PROCEEDINGS

On August 9, 1994, Alvin Debois Turner was indicted on one count of distributing, on July 23, 1993, 68.8 grams of a mixture containing detectable cocaine base in violation of 21 U.S.C. § 841(a)(1) and of distributing, on August 11, 1993, 76 grams of a similar substance in violation of the same statute. On September 28, 1994, William Earl Jones and Michael Joel Davis were indicted for conspiracy to sell narcotics with a cocaine base in violation of 21 U.S.C. § 846 and for distributing, on March 10, 1993, 39 grams of a substance with a cocaine base and for distributing, on March 25, 1993, 85.4 grams of a substance with a cocaine base and for distributing, on April 28, 1993, 52.9 grams of a mixture with a cocaine base. On October 28, 1994, Frederick Banks was indicted for distributing, on December 14, 1993, 81 grams of a substance with a cocaine base. On August 18, 1995, Ronald Wayne Johnson was indicted for conspiracy with others to distribute a substance with a cocaine base and for distributing on September 16, 1993, 69.2 grams of a substance with a cocaine base.

All of the defendants are African Americans. They contended that they had been selected for prosecution on crack cocaine charges on racial grounds. Turner sought discovery of the following from the government:

(1) all statistical information in the government's possession regarding the racial and ethnic identity of individuals prosecuted for distribution or intent to distribute co-

caine base or cocaine hydrochloride under federal and state laws during 1990 to 1994; (2) all statistical information in the government's possession regarding the racial identity of people arrested in the Central District of California during 1990 to 1994 as a result of federal, joint local and federal, or local law enforcement investigations for offenses involving cocaine base or cocaine hydrochloride; (3) Any and all manuals, handbooks, pamphlets, memoranda and other documents containing information regarding the policies or practices of the Department of Justice, the United States Attorney's Office for the Central District of California, all federal law enforcement and/or investigative agencies and all law enforcement and prosecutorial agencies within the County of Los Angeles concerning the prosecution of individuals for offenses involving cocaine base [or cocaine hydrochloride], including, but not limited to, those documents which discuss when such cases will be or are accepted or referred for federal prosecution and when such cases will be accepted or referred to the state authorities for prosecution; (4) all statistical information in the government's possession concerning the race, geographic location of residents, social class, income level or other demographic information regarding individuals who use, distribute, or possess with intent to distribute, cocaine base in the Central District of California; (5) all information regarding all persons arrested in connection with joint task force investigations in the Central District of California who have been rejected for federal prosecution, and the same information regarding persons rejected for state prosecution.

The other defendants filed substantially similar motions.

The motions of the individual defendants for discovery were consolidated and heard together. In support of their motions, they submitted memorandum of a paralegal in the Federal Public Defender's Office for the Central District of California stating that an inspection of closed cases of crack cocaine prosecutions defended by that public defender in 1991, 1992, and 1993 showed 47 African Americans, 5 Latino, and no white defendants had been charged with crack offenses. This memorandum was supplemented by reference to the evidence before the court in *Armstrong,* by newspaper articles and a National Public Radio report commenting on "the racial divide" in crack cocaine prosecutions, and by a study conducted by Richard Berk and Alec Campbell, "Preliminary Data on Race and Crack Charging Practices in Los Angeles," 6 *Federal Sentencing Reporter* 36–38 (July–August 1993). The Berk–Campbell study covered data from 1988 to 1992. The study showed 3% of 8,250 persons charged with the sale of crack by the Los Angeles District Attorney to be Anglo, 53% to be African American, 43% to be Latino, and 1% to be "other." The comparable federal breakdown of 43 persons similarly charged was 0% Anglo, 83% African American, 16% Latino, and 0% Other.

In response to these motions, the government offered the affidavit of Ronald L. Iden, Special Agent in charge of the Los Angeles Division of the Federal Bureau of Investigation (the FBI). He stated that in January 1992 the Attorney General and the Director of the FBI had established a "Safe Streets" Initiative within the FBI to address violent street crime proactively and aggressively. During 1992 the number of FBI agents in Los Angeles committed to this program was increased to 121 agents. Iden detailed how he had coordinated the efforts of the FBI with four bureaus of the Los Angeles Police Department, the Los Angeles Sheriff's Department, and the Police Departments of Compton, Inglewood, and Long Beach.

Iden submitted data showing that within Los Angeles County much of the violent crime committed by street gangs, such as robbery, assault, and murder, was connected to illegal drug trafficking. He stated his own belief that "no single event has contributed more to the explosive growth of violent street gangs within the United States ... than the wide availability of cocaine base ('crack' or 'rock' cocaine) within American cities since the mid-to late 1980s." He identified two violent street gangs, the Bloods and the

Crips, as the most notorious of the gangs, deriving tremendous profits by trafficking crack cocaine to other cities and expanding their activities throughout the United States.

Iden explained federal prosecution policy by observing that "[o]ften, narcotics investigations are used to dismantle violent criminal gangs" and that the "enforcement of the federal laws regarding crack cocaine [was] one weapon in addressing the problem of gang-related violent crimes in the City of Los Angeles and elsewhere in the Central District." He filed under seal the composition of the enforcement groups investigating violent street gangs and the gangs that they were investigating. He declared: "At no time is race or ethnicity ever a factor in any decision by the FBI." He noted that in the fiscal year 1994, 110 defendants were arrested as part of the joint federal-local effort for safe streets and charged in state court with the distribution of crack cocaine and that all of these defendants were either African American or Hispanic. Specifically, as to the defendants in the cases before us he noted that Banks had been identified as a gang member of the P.J. Crips; that he had a criminal history; that he was observed carrying a gun while distributing cocaine; and that Banks had informed a cooperating witness that he was transporting cocaine to sell in Alabama.

The government also furnished the affidavit of FBI Special Agent Timothy S. Flaherty, who stated that in the course of his investigation of the P.J. Crips, an armed and violent street gang engaged in the distribution of narcotics, Alvin Debois Turner was identified as a P.J. Crips gang member with three felony drug convictions, and that in the course of the investigation Turner sold crack cocaine to a confidential witness. In a separate affidavit, Flaherty stated that Ronald Wayne Johnson was identified as a P.J. Crips member based on a confidential informant's identification of him as "Heaty," Turner's brother, and as a seller of crack, and that in the course of the investigation Johnson sold crack cocaine to the informant.

The government also offered the affidavit of FBI Special Agent Ronald L. Anderson, who stated that he had been investigating the Shoreline Crips, operating in the area known as Oakwood in Venice, California. In the course of this investigation several confidential informants identified William Earl Jones and Michael Joel Davis as active members of the Shoreline Crips. Davis had one narcotics conviction. Jones had several and a conviction for the wilful discharge of a firearm, a charge stemming from a drive-by shooting.

The Assistant United States Attorneys involved in these prosecutions submitted affidavits that race and ethnicity had not influenced their decisions to prosecute. The government submitted under seal the affidavit of Assistant United States Attorney Jeffrey C. Eglash. Attached as an exhibit was a copy of the United States Attorney's Office's written prosecutive guidelines regarding drug offenses. The guidelines advise prosecution by race-neutral criteria, including the quantity of drugs or the presence of aggravating circumstances, such as subjects with prior felony convictions. The government also submitted an updated report on the ethnic composition of its crack cocaine prosecutions in Los Angeles.

After consideration of the evidence, the district court found that the FBI in Los Angeles and the Los Angeles Police Department had targeted inner-city areas "populated almost exclusively by minorities" in order to identify and prosecute violent street gangs. The district court said that the prosecution in these cases "must stand or fall, therefore, on [the U.S. Attorney's Office's] contention that, as a matter of law, it is appropriate to focus crack prosecutorial decisions on black gang members perceived to be involved in street crime, and that the government does not have to provide any of the information upon which this prosecution rests." The court concluded that the prosecution's case must fall.

In reaching this conclusion, the court noted that the defendants had all been subjected to two or more stings by law enforcement task forces, being arrested only after the second sting resulted in an amount of drugs sufficient to warrant a high sentence. The court noted what the government had provided in its study of all the indictments or informations filed in the district on crack trafficking

charge between January 1992 and March 1995. Of 149 defendants charged with these offenses, 109 (74.4%) were black, 28 (19.2%) were Hispanic, and 8 (5.5%) were Asian. Three were unclassified and only one defendant was white. The court declared: "These statistics create a strong inference of discrimination," and that, standing alone, the statistics established more than was necessary as a colorable basis for requiring discovery, unless the government could show that the data was "explained by race-neutral factors."

The court then considered the factors offered by the government and focused in particular on the criterion of membership in, or association with, a violent street gang. Far from being race-neutral in the court's view, this criterion, the court found, "creates racial bias in the prosecutorial selections. Because the task force investigations involve primarily black gangs, those who are identified by task forces as gang members must also be primarily black." The court declared: "If these defendants had been white persons engaged in the same criminal activities, they would not have been suspected of any gang association, they would not have been stung by the government to increase the penalty for the offense, and they would not have been selected by the U.S. Attorney for prosecution. They would not have been here today. Their real offense is alleged gang association, not the crack offenses with which they are charged."

The court accordingly issued the discovery orders requested by the defendants. The government declined to comply. The court dismissed the indictments.

The government appeals.

## ANALYSIS

■ In order to be entitled to discovery to establish a defense of selective prosecution, a defendant cannot rely upon Federal Rule of Criminal Procedure 16(a)(1)(C). *United States v. Armstrong*, — U.S. —, —, 116 S.Ct. 1480, 1485, 134 L.Ed.2d 687 (1996). A defendant may, however, obtain discovery if he makes "the appropriate threshold showing." *Id.* The appropriate threshold showing is to be conducted against the "background presumption" that the Attorney General of the United States and United States Attorneys are properly discharging their official duties and not acting with a racial bias contrary to the commands of the Constitution. *Id.* at —, 116 S.Ct. at 1486.

■ To determine the appropriate threshold it is important to have in view what a . successful defense of selective prosecution would establish. To succeed as a defense, the defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at 1487 (quoting *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)). Both prongs must be demonstrated for the defense to succeed. "[A]wareness of consequences" is not the same as intent to discriminate. The kind of intent to be proved is that the government undertook a particular course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Wayte,* 470 U.S. at 610, 105 S.Ct. at 1532.

■ The threshold requirement to obtain discovery on the way to proving such a defense must relate to the defense to be proved. In *Armstrong* the Supreme Court held that the defendants must produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Armstrong,* — U.S. at —, 116 S.Ct. at 1488. The threshold showing has not been made.

The showing made by the defendants in these cases relied on the data offered in *Armstrong* establishing that in 1991 only African Americans had been defended on crack cocaine charges by the Federal Public Defender for the Central District. This data the Supreme Court found inadequate, observing that in 1994, "93.4% of convicted LSD dealers were white," and "91% of those convicted for pornography or prostitution were white." *Id.* at —, 116 S.Ct. at 1489. Numbers of this sort did not advance a defense of selective prosecution without further consideration of the sociological factors affecting the pattern of crime and without a

showing that similarly-situated defendants of other races had been left unprosecuted.

The defendants here, beyond enlarging the kind of statistics offered in *Armstrong* and providing newspaper anecdotes and hearsay, have offered only the Berk–Campbell report. That report, based on a statistically unimpressive number of federal defendants, shows at most that the state of California did prosecute a small number of Caucasian crack cocaine sellers. Nothing in the report, however, shows whether these sellers were similarly situated to the sellers chosen for prosecution here. In particular, there is no showing at all that the crack cocaine sellers prosecuted by California were gang members who sold large quantities of crack; so the principal characteristic of the federal defendants is omitted.

■ The defendants have shown no more than the consequences of the investigation of violent street gangs, not that they were targeted because of race. That such gangs should be targeted is a neutral, nonracial law enforcement decision; the distribution of cocaine by gang members inclined to violence makes the distribution more heinous and more dangerous than the single sale of cocaine by individuals. *See United States v. Bourgeois*, 964 F.2d 935, 941 (9th Cir.), *cert. denied*, 506 U.S. 901, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992). The appellees have offered no evidence whatsoever of an intent on the part of the prosecutors to prosecute them on account of their race, and the prosecutors and FBI investigators have under oath denied such motivation. No reason was given by the district court to doubt the "background presumption" that United States Attorneys are properly discharging their duties, no reason given to doubt the integrity of prosecutors and investigators whose honesty, good faith, and absence of racial bias are unimpaired by anything in evidence before the court. The district court seems to have neither given credence to the affidavits that the government placed before it nor explained why the affidavits were not credible. The government had not taken the posture attributed to it by the court that it had no obligation to provide the information on which its prosecutions rested. The government had provided precisely that information. The discovery requests failed to meet the *sine qua non* for discovery attendant on a selective prosecution claim. It was an abuse of discretion for the court to grant them.

The appellees offer this hypothetical: if the government set up a road block in Beverly Hills it would end up catching and prosecuting Caucasian criminals. Analogously, the government has set up the equivalent of a road block in South Central Los Angeles and so ends up catching and prosecuting African Americans. The thesis of the appellees is that selection of a particular community for a particular enforcement operation constitutes racial discrimination if it is foreseeable that because of the ethnic composition of the community one race will necessarily provide most of the government's targets.

The defendants' hypothetical has a superficial attraction but is seriously flawed. It is not entirely unnatural for an observer noting ethnic identity to come to the conclusion that when almost all the defendants charged with a particular offense have a certain skin color or ethnic identity that a racial or ethnic prejudice must be at work in the selection. Such an observer, however, must not be very familiar with the demographic and occupational patterns of the United States. Despite our reputation as a melting pot, different neighborhoods and different occupations often attract distinct racial or ethnic groups; so that if a particular kind of crime comes into vogue it may well be a feature of a neighborhood or of an occupation marked by one or another ethnic or racial characteristic.

In effect, as applied in this case, the defendants' hypothetical is an argument that the minorities of the inner city of Los Angeles must be denied the protection of law enforcement by the federal government because the likely suspects are overwhelmingly apt to be members of the minority living in that area. The defense is a grave perversion of proper sensitivity to the civil liberty of minorities. If any policy of government had a racially discriminatory effect, it would be to deny law

enforcement on the grounds of a specious claim of racial discrimination.

**REVERSED.**