**UNITED STATES of America,**

v.

**Michael TUITT, Defendant.**

**No. CR. 98–30048–MAP.**

United States District Court,
D. Massachusetts.

Sept. 10, 1999.

Linda J. Thompson, Jacobson & Thompson, P.C., Springfield, MA, for Defendant.

William M. Welch, II, Kevin O'Regan, United State's Attorney's Office, Springfield, MA, for U.S.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR DISCOVERY (Docket No. 44)*

NEIMAN, United States Magistrate Judge.

Michael Tuitt ("Defendant") is being prosecuted in connection with the alleged sale of 4.6 grams of cocaine base, *i.e.*, crack cocaine, to an undercover government agent in violation of 21 U.S.C. § 841(b)(1). Together with Khadijah Watt, Defendant was indicted on December 17, 1998. Presently before the court is Defendant's motion to obtain discovery from the Government relative to his claim that the federal controlled substance laws prohibiting the possession and/or distribution of cocaine in the form of cocaine base are being unfairly, arbitrarily and discriminatorily enforced against him, an African American. In particular, Defendant seeks an order requiring the Government to disclose a range of information concerning criminal matters within the jurisdiction of the United States District Court for the District of Massachusetts, as well as separate information concerning criminal matters within the jurisdiction of the western section of the district, from January 1, 1986 through December 31, 1998.

The Government asserts in response that Defendant has failed to demonstrate a threshold level of selective prosecution to warrant discovery. In essence, the Government maintains that, as required by *United States v. Armstrong,* 517 U.S. 456, 470, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), Defendant has failed to proffer evidence demonstrating that white males similarly situated to him have not been prosecuted for distributing crack cocaine. For the reasons which follow, the court will allow Defendant's motion in part.

A.

Before addressing *Armstrong* and its application to the case at bar, the court notes, and sets aside, an initial claim made by Defendant regarding sentencing disparities between crack cocaine and powder cocaine offenses. Although Defendant has expended much energy addressing this alleged constitutional violation, (*see* Def.'s Mem. of Law in Supp. [of] Mot. for Disc., Evidentiary Hr'g and Other Relief ("Def.'s Mem.") at 1–4), he has failed to establish a significant difference between his case and the facts underlying the First Circuit's decision in *United States v. Singleterry,* 29 F.3d 733 (1st Cir.1994).

*Singleterry* rejected claims that disparate sentences for crack and powder cocaine distribution were unconstitutional be-

cause of their disproportionate effect on blacks. *Id.* at 741. *See also United States v. Hayden,* 85 F.3d 153, 157–58 (4th Cir. 1996) (noting that "[m]any other circuits have also upheld the sentencing disparity between crack cocaine and powder cocaine"). The court found that it was rational for Congress to punish crack cocaine more severely than powder cocaine offenses:

> For example, Congress could rationally seek to strengthen the deterrent effect of the narcotics laws by increasing the "cost" to a criminal of using or selling a cocaine substance that, like cocaine base, is sold at a cheaper unit price than other cocaine substances. Indeed, of the four citations to the Congressional Record that Singleterry offers in his opening brief as probative of congressional intent, each suggests that Congress has been concerned that the low price of cocaine base (in the absolute sense as well as relative to cocaine) would lead to an explosion in drug use.

*Singleterry,* 29 F.3d at 740. To be sure, the court acknowledged the existence of "important questions about the efficacy and fairness of our current sentencing policies for offenses involving cocaine substances." *Id.* at 741. However, it left "the resolution of these matters to the considered judgment of those with the proper authority and institutional capacity." *Id.*

Defendant's attempt to distinguish his case from *Singleterry* is unavailing. In sum, the court sees no distinguishing features. In fact, the Government points out that, were Defendant found guilty of the offenses charged, his guideline range as a career offender would be the same whether he had sold the undercover agent crack or powder cocaine. (*See* Gov't's Supplemental Mem. in Resp. to Tuitt's Mot. for Disc. Concerning Selective Prosecution ("Gov't's Supplemental Mem."), O'Regan Aff., ¶¶ 9, 10.) Accordingly, the court turns its attention to the crux of Defendant's argument, whether, under *Armstrong,* he is entitled to discovery relevant to his selective prosecution claim. That issue is measured by different standards.

## B.

*Armstrong* held that a defendant claiming selective prosecution must make "a credible showing of different treatment of similarly situated persons" before discovery can be ordered with respect to that claim. *Id.,* 517 U.S. at 470, 116 S.Ct. 1480. The Supreme Court determined that a district judge cannot order such discovery unless a defendant first provides evidence that the government failed to prosecute "similarly situated" members of other races, which the defendants in *Armstrong* failed to do. *Id.*

There is no question that the Supreme Court in *Armstrong* set a "rigorous" standard for defendants seeking the type of discovery sought here. *Id.* at 468, 116 S.Ct. 1480. Defendant acknowledges the heavy burden placed upon him. In setting that standard, the Court first reviewed the "demanding" standard applicable to the underlying selective prosecution claim. *Id.* at 463, 116 S.Ct. 1480. Such a claim, the Court explained, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecution brought the charge for reasons forbidden by the Constitution." *Id.* Accordingly, the Court reasoned, "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463–64, 116 S.Ct. 1480. The Court did not want "to unnecessarily impair the performance of a core executive constitutional function." *Id.* at 464–65, 116 S.Ct. 1480. Quoting *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), the Court explained that "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecution's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement

policy." *Id.* at 465, 116 S.Ct. 1480. Accordingly, the Court held that a defendant can obtain discovery only by making "a credible showing of different treatment of similarly situated persons." *Id.* at 470, 116 S.Ct. 1480. This "rigorous standard," the Court concluded, "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.*

Applying the standard to the case before it, the Supreme Court concluded that the proffered evidence failed to pass the necessary threshold. The Court found one study—in which the Federal Public Defender's office indicated that every one of the twenty-four cocaine cases closed by the office in 1991 involved defendants who were black—"failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.* The Court also found that a proffered newspaper article, "which discussed the discriminatory effect of federal drug sentencing laws, was not relevant to an allegation of discrimination in decisions to prosecute." *Id.* Finally, the Court explained that affidavits, "which recounted one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court, recounted hearsay and reported personal conclusions based on anecdotal evidence." *Id.*

The Supreme Court's rejection of the evidence proffered in *Armstrong* has convinced some commentators that the decision renders many meritorious claims of selective prosecution impossible to prove. *See, e.g.,* Richard H. McAdams, *Race and Selective Prosecution: Discovering the Pitfalls of Armstrong,* 73 Chi. Kent L.Rev. 605, 606 (1998); Melissa L. Jampol, *Goodbye to the Defense of Selective Prosecution,* 87 J.Crim.L. & Crimonology 932 (1997); Note, *Race–Based Selective Prosecution,* 110 Harv.L.Rev. 165 (1996). *See also* RANDALL KENNEDY, RACE CRIME AND THE LAW 357–59 (1997). Still, this court believes, as Chief Justice Rehnquist acknowledged in *Armstrong,* that it ought not be "an insuparable task to prove that persons of other races [are] being treated differently" by prosecutors. *Id.,* 517 U.S. at 470, 116 S.Ct. 1480. Justice Breyer also opined that "it should [be] fairly easy for defendants to find, not only instances in which the Federal Government prosecuted African–Americans, but also some instances in which the Federal Government did not prosecute similarly situated caucasians." *Id.* at 476, 116 S.Ct. 1480 (Breyer, J., concurring). Interestingly enough, Justice Stevens, in dissent, agreed that the evidence proffered by the defendants was not sufficient to require further discovery. However, Justice Stevens explained, he was "persuaded that the District Judge did not abuse her discretion when she concluded that the factual showing was sufficiently disturbing to require some response from the United States Attorney's Office." *Id.* at 477, 116 S.Ct. 1480 (Stevens, J., dissenting).

### C.

The Government asserts that Defendant's proffer, detailed below, is deficient because it fails to establish that whites similarly situated to Defendant have not been prosecuted federally for distributing crack cocaine because of their race. Rather, the Government asserts, Defendant's evidence is essentially identical to the proffer in *Armstrong* and, therefore, must be rejected as inadequate.

The court disagrees. Despite the high threshold set by *Armstrong,* the court believes that Defendant's evidence goes well beyond that offered in *Armstrong* and has significant force. Because the substance of that evidence is not challenged by the Government, although its import is, the court accepts the following proffered evidence as accurate.

Defendant's counsel's investigation of cocaine base prosecutions in the western section of the district, which covers the four western counties of the Commonwealth,

reveals that no whites have been prosecuted for such offenses during calendar year 1998. Rather, the evidence offered shows that the nine federal indictments for cocaine base crimes during 1998, including the instant one, involve a total of nineteen defendants, fourteen black males, three black females and two hispanic males. (*See* Def. Tuitt's Mot. for Enlargement of Time to File Selective Prosecution Mot., ¶¶ 3–4.)[1] During the same calendar year, 1998, there was one federal indictment involving powder cocaine in the western section of the district; the three defendants charged in that indictment are all hispanic. (Def. Michael Tuitt's Mot. for Disc., Evidentiary Hr'g and Other Relief Related to Discriminatory Enforcement ("Def's Mot."), ¶¶ 4–6; *id.*, Ex. 1 (Aff. of Att'y Linda Thompson), ¶ 4.)

Defendant also claims that no non-hispanic whites were charged in the western section of the district in 1996, 1997 or 1999 (January through May). (*See* Aff. of Myles Jacobson attached to Tuitt's Reply to Gov't's Supplemental Mem., Ex. A (letter to Att'y O'Reagan dated May 28, 1999).) If true, the evidence of federal prosecutions of blacks, but not whites, becomes even more stark. However, because the Government has not responded to these particular factual assertions, the court focuses its analysis on the data provided by Defendant for calendar year 1998 only.

Defendant contrasts the 1998 federal information with evidence concerning the numbers of individuals, by race and ethnicity, charged in the state courts of Hampden County with powder cocaine and crack cocaine offenses during the same year. As the court understands his proffer, Defendant's data concentrates on a four month period in 1998, August through November. (Def.'s Mot., ¶ 7; Tuitt's Supplemental Mem. for Disc. Concerning Discriminatory Prosecution ("Def.'s Supplemental Mem.") at 5–7.) During this period, there were 299 prosecutions commenced in Hampden County Superior and District courts for offenses involving the possession or distribution of crack cocaine. Of these, 170 were brought against blacks, 99 against hispanics, and 30 against whites. (*See* Def.'s Mot., ¶ 7; *id.*, ¶ 4(b)–(h); Tuitt's Assented to Mot. to Substitute Corrected Ex. G.) Extrapolating this data to the entire 1998 calendar year, Defendant asserts that blacks accounted for approximately 57% of the prosecutions, hispanics 33% and whites 10%. In contrast, whites comprised 0% of the prosecutions in federal court for the same calendar year.[2]

The court takes note of several additional facts relative to the state court data. First, as Defendant points out, the state statistics do not include defendants represented by private counsel. Rather, the statistics are based on an examination of records of the Springfield office of the Committee for Public Counsel Services ("CPCS") which represents indigent defendants in Superior Court, as well as notices of assignments of counsel in the county's

---

1. Of the nine indictments, seven allege possession and/or intent to distribute at least five grams of crack cocaine with regard to each defendant and four allege possession and/or intent to distribute fifty grams or more. One indictment alleges both possession with intent to distribute and carrying a firearm during a drug transaction. Only the indictment of Defendant and his co-defendant involves less than five grams of crack cocaine.

2. Defendant also provides statistics from the Springfield Police Department regarding the number of persons arrested in Springfield, the largest city in Hampden County, for selling or manufacturing opium/cocaine derivatives during calendar year 1998. Of a total of 415 arrestees, 182 were black (44%), 170 were hispanic (41%), and 63 were white (15%). (Def.'s Supplemental Mem. at 4–5 and Ex. B.) Defendant acknowledges that this data is not separated into crack and cocaine offenses. For calendar year 1997, 598 persons were arrested in Springfield for crack cocaine offenses. Of those, 320(54%) were black and 67(11%) were white. (*Id.* at Ex. C.) The data is not divided by level of offense. During this same period, 157 persons were arrested for powder cocaine offenses, of which 33(21%) were black and 70(44%) were white. (*Id.*)

district courts maintained by the Hampden County Bar Advocates Office ("HCBAO"). Attorneys with HCBAO represent indigent criminal defendants on a daily basis in every district court in the county: Chicopee, Palmer, Westfield and Springfield.

Second, HCBAO records, which specify the assigned attorney's name, the defendant's name and the criminal charges, are not computerized. In order to compile the data, Defendant explains, it was necessary for his counsel to go through all the forms for the four month period, record the information and contact the assigned attorney. This last step was made necessary for several reasons. For one, Massachusetts does not distinguish between powder cocaine and crack cocaine for purposes of either charging or sentencing; all offenses involving cocaine are charged as Class B offenses. According to Defendant, the assigned attorney could provide the information regarding the type of cocaine involved; when, in the end, an attorney was not able to specify whether the substance was crack or powder cocaine, the case was not included in the numbers presented. Moreover, the assigned attorney had information regarding the defendant's race. Defendant's counsel reports that she and her staff contacted each of the eighty assigned attorneys by telephone or facsimile transmissions. Fifty-three attorneys contacted responded substantively. Approximately thirteen of the remaining twenty-seven agreed to search and provide the requested information.

Third, Defendant's counsel isolated Class B cocaine prosecutions for 1998 from the list of cases handled by the CPCS in the one Superior Court located in Hampden County. There were forty-eight cocaine cases defended by seven CPCS attorneys. All seven attorneys responded with some substantive information. If the attorney was unable to specify whether the

substance at issue was crack or powder cocaine, the case was omitted from the statistics provided to this court. (Def.'s Mot., Ex. 1, ¶ 4(b) –(c).)

In the court's view, Defendant's evidence more than speaks for itself. Indeed, at oral argument, the Government acknowledged that the evidence could "raise an eyebrow." More importantly, the information provided by Defendant, unlike that provided in *Armstrong*, is not anecdotal or confined to statistics arising out of the federal district itself. Rather, Defendant has also undertaken a comprehensive survey of the local state courts in order to provide an appropriate comparison.

In this regard, the court takes notice of the racial make-up of the four western counties in its jurisdiction. (*See* Def.'s Supplemental Mem., Ex. A.) Hampden County, from which the state prosecution data has been derived, has a total population of 440,974, of which non-hispanic whites represent 78.2% (344,713) and blacks represent 9.8% (43,014). Of the remaining three counties, with a total population of 355,721, 93.9% (334,173) are non-hispanic whites, whereas blacks comprise barely 2.0% (7,123). Accordingly, the court believes that comparable data regarding state prosecutions of cocaine charges in the three remaining counties, if available, would likely make the disparity between state and federal prosecutions of whites even more stark.[3]

## D.

When discussing selective prosecution, *Armstrong* speaks of both discriminatory effect and discriminatory intent. *Id.,* 517 U.S. at 468, 116 S.Ct. 1480. *Armstrong* also acknowledges the "degree of consensus" that courts of appeals have reached in establishing the requisite showing for dis-

3. Although Congress rejected the recommendation of United States Sentencing Commission's February 1995 Special Report to Congress to change the disparity between crack cocaine and powder cocaine sentencing guidelines, the underlying evidence offered by the Sentencing Commission does indicate that whites are the majority of crack cocaine users. (*See* Def.'s Mem. at 4–6.)

covery with respect to selective prosecution: " 'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect *and* discriminatory intent." *Id.* (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974) (emphasis added)). However, in discussing the discovery issue, the Court claims to address the discriminatory *effect* element only. *See id.* at 469, 116 S.Ct. 1480. Thus, it is hard to tell what evidence of *intent* a defendant must produce in order to obtain discovery. As described above, *prima facie* evidence of effect is difficult enough to adduce.

■ Given the Supreme Court's actual analysis of the evidence offered in *Armstrong*, however, which in some ways appears to conflate the elements of effect and intent, this court believes that the evidence proffered by Defendant in the present matter more than adequately meets the rigorous discovery standard imposed. A discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). If the Supreme Court meant to hold defendants to actual knowledge of a discriminatory choice on the part of a prosecutor—which, after all, would encompass the underlying claim of selective prosecution—the discovery standard would be impossible to meet. It is exceedingly rare for a prosecutor to admit that the decision to prosecute was based on ethnicity or nationality. *See United States v. Al Jibori*, 90 F.3d 22, 26 (2d Cir.1996).

### E.

There can be no doubt that the sufficiency of evidence of both effect and intent for discovery purposes must be resolved on a case-by-case basis. This, of course, is easier said than done. For example, the evidence proffered by Defendant is not quite the same as the information suggested in the example offered by Justice Rehnquist in *Armstrong*, namely, "whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court." *Id.*, 517 U.S. at 470, 116 S.Ct. 1480. While Defendant clearly has met the first portion of the example, *i.e.*, similarly situated whites prosecuted by the Commonwealth of Massachusetts, he offers no inside information, whether direct or anecdotal, of a deliberate choice on the part of the Government not to prosecute such individuals in federal court. Nonetheless, while Defendant's proffer may fall short of Justice Rehnquist's example, it more than adequately passes muster under the actual standard set by the Court.

The Government's argument in *Armstrong* sheds significant light on what may constitute a sufficient evidentiary proffer to obtain discovery. In urging the Supreme Court to reverse the Ninth Circuit Court of Appeals, the Solicitor General argued in his reply brief that the defendants had failed to avail themselves of California state court records which were open to inspection and could provide supporting data. *See United States v. Armstrong*, 1996 WL 67650, at *16–17 (U.S.Reply.Brief 1996). The Solicitor General reaffirmed this position at oral argument. The following colloquy between the Solicitor General and the Court provides some clarity as to how a defendant might approach his task in light of the decision ultimately reached by the Court:

QUESTION: Well, can you tell us what the details would be? In a case like this, just what evidence that's accessible to the defendant would be necessary to establish a basis for discovery?

GENERAL DAYS: Justice Ginsburg, the respondents have made the suggestion that the evidence that they need is within the control of the Government, but that is simply not so.

QUESTION: But at least would you seek—

GENERAL DAYS: There were many things that the respondents could have done, and let me lay them out.

QUESTION: Right.

GENERAL DAYS: They could have done a further review of their own files. They had looked at only cases closed in 1991, even though those cases would have been brought over a 3–year period. This is a Federal public defender's office. Presumably there are State public defender's offices, and they could have contacted those offices to determine whether the racial pattern that they asserted was reflected in Federal court was present or absent in State prosecutions.

Also, one of the respondents' counsel provided a declaration. Mr. Reed indicated—

QUESTION: Mr. Solicitor General, suppose—I don't remember which brief it is. One of the amicus briefs says if you looked a little harder at statistics you'd find that there is a difference in the pattern in State and Federal courts. If those facts are correct, and if they had been presented to the district court, would it have been appropriate to have discovery here?

GENERAL DAYS: Well, Mr. Justice Stevens, it really would depend upon the nature of that evidence and whether it provided a basis for the court—

QUESTION: Well, if they came in with an affidavit, the public defender said, our files in State court show that 50 percent of the crack prosecutions are not Afro–Americans, whereas 100 percent of the Federal prosecutions are, would that be sufficient for discovery?

GENERAL DAYS: I think the court would have to decide whether that information—

QUESTION: How would you decide if you were the court?

GENERAL DAYS: Well, I'd have to look at the universe. I would have to look at—

QUESTION: The universe is the files of the Federal—of the State defender and the Federal defender in 1991.

GENERAL DAYS: I think 1991 would be too narrow a time frame for that type of determination.

QUESTION: Even if there are 100 cases in each file?

GENERAL DAYS: I don't think that that would be the case, Justice Stevens. I think that would be inadequate under these circumstances. It certainly would not solve the second part of the problem, which is whether there's some indication of discriminatory intent.

*United States v. Armstrong,* 1996 WL 88550, at *6–8 (U.S.Oral.Arg.1996).

Justice Ginsburg returned to the issue later:

QUESTION: General Days, before we get to the question of what could be discovered if there could be discovery, you were going to tell me what in the Government's view would be necessary concretely to satisfy that substantial threshold question, and you gave one answer that I found surprising, but it was your answer that even if you had 100 percent African–Americans in Federal court in a given year and 50 percent Caucasians in the State court in that same year, that that would not have been enough.

GENERAL DAYS: Well, I think that, Justice Ginsburg, under those circumstances the Court might well ask the Government for some indication, but it may not result in full discovery, or the providing by the Government of the type of information that was being sought here to the defendants.

QUESTION: But you said that would require something rather than nothing, but if—I'm just not clear on—the Government does the negative side—

GENERAL DAYS: Yes.

QUESTION:—well, but you don't say what it would take.

GENERAL DAYS: Well, I think that the example that Justice Stevens gave, and you gave, would be going a very long way toward showing that there was a selection. There would be people similarly situated. At least presumably that would require the Government to say something in response to that, but we certainly don't have that in this case, and what the Ninth Circuit has done is completely dispense with that requirement.

Basically, what the en banc court held was, there's no need to show a comparable pool. What you're talking about is a comparable pool, a statistical disparity. Well, what the Ninth Circuit said was, in cases like this there's no need for that comparable pool. One simply assumes that persons of all races commit all crimes.

Now, that has some rhetorical power, but the question is, what objective rule it offers is very hard to discern.

QUESTION: Okay, but if we agree with you that in fact there's—there are two prongs involved here, and we then pose Justice Ginsburg's question, what if they had come in with the evidence which I guess turned up later, a year or so later in the State reports, that something like 50 percent of the State crack prosecutions were Caucasians, I take it—and please correct me if I'm wrong—that you would say, even though that addressed the second prong, it did not address it to a sufficient degree.

It did not meet the high—the substantial threshold test, and I assume the reason you would say that is because the State statistics do not show how many of these people were gun carriers, and it doesn't show the severity of the offense. Did they have just a little bit of crack, or were they dealers, and so on.

You would say that it still wasn't enough, even though it addressed the question of comparability, to show that there really was comparability. Would that be the Government's position?

GENERAL DAYS: No, Justice Souter. If you're referring to the Burke study that was introduced later, that is a study that I think proves only one thing that's relevant in our estimation in the context of this case, and that is that the defendants in that particular proceeding where the Burke study was introduced were able to show that they could get this information, and therefore the argument that respondents make in Armstrong, in this case, that they could not have acquired that comparative information, really seems quite unpersuasive.

QUESTION: Well, let's just assume that they couldn't have had anything but the terms of the study, and they said, this satisfies each of the prongs.

GENERAL DAYS: Yes.

QUESTION: Would it be the Government's position that it didn't satisfy the second one because it did not show to a sufficiently high or probable degree that there really was comparability?

GENERAL DAYS: No, Justice Souter. The en banc court suggests that what the Government was demanding here was that defendants include some sophisticated regression analyses closely following the dictates of the scientific method. That is not what we were suggesting. We think in a situation such as you describe the Government would have a responsibility to come forward and show, in some fashion or another, that there was an absence of comparability, but we don't think that defendants should be put to the—

QUESTION: Okay, so you—

GENERAL DAYS:—responsibility of figuring out at every point the degree to which one group is comparable to the other.

QUESTION: But you would say, then, that you had a burden to respond.

GENERAL DAYS: Yes.

QUESTION: But not a burden to comply with the discovery request.

GENERAL DAYS: Well, I think where there is this similarly situated showing, that may well shift the burden to the Government—

QUESTION: No, but I want to understand—I, like Justice Ginsburg, I'm trying to get an example so that I know what we really mean—

GENERAL DAYS: Yes.

QUESTION:—when we use the terms, and I take it in the example you're saying—that I gave, that that would result perhaps in a shifting of the burden of persuasion, or at least the burden of going forward, but it would not result in a satisfaction of this threshold which would obligate you to produce the discovery that they want.

GENERAL DAYS: Well, not the full discovery. In other words, it would not operate automatically, but I think, Justice Souter, that unlike this case, when the defendants actually show that there is a similarly situated group—that is, there appears to be some comparability between the two populations—that then gives the district judge some authority to probe that, and to evaluate exactly what those figures mean.

QUESTION: So some discovery, then, would—so you're saying discovery is a step-by-step process, and the Government would perhaps not merely have had the burden shifted back to it, but the Government could properly be subjected by the district judge, as it were, to satisfy that burden. The judge could say, look, you produce some rebutting evidence, and you would be subject to that degree of discovery, is that correct?

GENERAL DAYS: Right. It's a step-by-step process once the defendants have shown a group of similarly situated individuals.

The problem with this particular case is that the judge was asking the Government to respond before there had been an established—

QUESTION: Oh, I quite—I realize that.

GENERAL DAYS:—situation.

QUESTION: But what you're saying, then, is that I think that it's a mistake to think of discovery—the discovery obligation as being an all-or-nothing obligation.

GENERAL DAYS: That's right. Take—

QUESTION: And you're saying that if you went as far as to get the Burke study in, there would be a discovery obligation to produce evidence, if you had it, that would tend to disprove the suggestion of comparability, and if you met that, that's where the process would end.

GENERAL DAYS: Yes.

*Id.*, at *15–21.

To summarize, the Solicitor General suggested that discovery may be ordered "when the defendants actually show that there is a similarly situated group—that is, there appears to be some comparability between the two populations." *Id.* at *20. For example, the Solicitor General advised, defendants may "further review ... their own files" or contact state public defender offices "to determine whether the racial pattern that they asserted was reflected in Federal court was present or absent in State prosecutions." *Id.*, at *6–7.

Defendant has taken up the gauntlet here and has provided the very information suggested. Relying on both federal and state court data for comparable periods of time, Defendant has demonstrated not only that no whites have been prosecuted in federal court, as was the case in *Armstrong*, but that similarly situated whites have been prosecuted in state court. At bottom, it appears from Defendant's proffer, as described above, that whites are committing crack cocaine offenses in the western section of the district court but are not being prosecuted federally.

### F.

The First Circuit has had occasion to flesh out *Armstrong,* albeit in an immigration law context, and its decision in *United States v. Magana,* 127 F.3d 1 (1st Cir. 1997), provides further support for allowing Defendant's discovery motion, at least in part. The defendants in *Magana* sought discovery because, they asserted, only Spanish-speaking individuals were being prosecuted for alleged immigration law violations. The First Circuit affirmed the denial of the motion, holding that the defendants had failed to make a *prima facie* showing of either discriminatory effect or intent. *Id.* at 8. The court found that defendants' reliance on a newspaper article and unsworn statements fell far short of the showing required for discovery to be allowed. *Id.* "At most," the court stated, "these facts, viewed favorably to the defendants, established that Spanish-speaking persons were being prosecuted by the [Immigration and Naturalization Service ('INS') ]." *Id.* Then, citing *Armstrong* and in an apparent effort to describe what kind of information could support a discovery request, the court stated that the materials offered by the defendants "contained no information about INS prosecutions, or the absence of them, of non-Spanish-speaking persons." *Id.* According to the court, "[t]he information presented ... addressed only one half of the critical proposition" and that "[i]n order to be permitted discovery in this area, the defendants were required to make a threshold showing that there were similarly situated persons who were not prosecuted." *Id.*

Here, unlike *Magana,* Defendant has offered information pertaining to similarly situated individuals who were not prosecuted. As described, Defendant has not only presented evidence of federal crack cocaine prosecutions of blacks, but the complete absence of such prosecutions of whites in the chosen time period. In addition, Defendant has compared federal and state prosecutions arising out of the same population and geographic area and has shown that whites represented at least 10% of state prosecutions as compared to 0% in federal court. This is the type of information suggested in *Magana.* In addition, it is the sort of information which Justice Stevens, dissenting in *Armstrong* for other reasons, found warranted close scrutiny: "[e]vidence tending to prove that black defendants charged with distribution of crack in the [judicial district] are prosecuted in federal court, whereas members of other races charged with similar offenses are prosecuted in state court." *Armstrong,* 517 U.S. at 480, 116 S.Ct. 1480 (Stevens, J., dissenting).

### G.

The Government maintains that Defendant's proffer falls short in at least two respects. First, the Government asserts that Defendant's evidence is not finely tuned enough:

At best, [Defendant]'s statistics demonstrate that many more blacks than whites are prosecuted for crack cases in state and federal court in Springfield. They do not demonstrate that any white defendants who were similarly situated to [Defendant]—*i.e.,* (1) who previously had been convicted of at least one drug crime and one crime of violence and (2) who then sold crack cocaine in a school zone—were not prosecuted by the federal Government due to their race. Indeed, [Defendant] has not identified one white career offender whom the federal government declined to prosecute for selling crack.

(Gov't's Supplemental Mem. at 5.) Second, the Government provides some case-specific information in support of its position that Defendant was not prosecuted because of his race and claims, in turn, that its explanation is sufficient to cause the court to deny Defendant's motion.

As to its first assertion, the Government seeks to define "similarly situated" too narrowly. In effect, the Government attempts to convert the "similarly situated" standard to an "identically situated" one.

*Compare United States v. Olvis,* 97 F.3d 739, 744 (4th Cir.1996) (holding "that defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them"). Were the court to accept the Government's approach, it would create an even higher barrier to discovery than the Supreme Court set in *Armstrong.* Granted, the Government's position, in the end, may support a nondiscriminatory justification for having prosecuted Defendant, but it does not require the court to demand of Defendant more finely-tuned evidence in support of discovery at this stage of the proceedings. As the matter now stands, Defendant is simply attempting to gain discovery so that he can more adequately determine whether a selective prosecution claim might indeed be viable.

The Government's second assertion is similarly unavailing. Through affidavits of two prosecutors and one special agent of the Drug Enforcement Administration, the Government purports to explain in race-neutral terms the circumstances behind Defendant's particular prosecution. The Government asserts that Defendant was identified by a cooperating witness as a crack cocaine supplier and that Defendant "was an appropriate subject of a criminal investigation because he had two prior convictions for either a crime of violence or a drug crime." (Gov't's Mem. in Resp. to Michael Tuitt's Mot. for Disc., Evidentiary Hr'g and Other Relief ("Gov't's Mem.") at 7.) According to the Government, "[i]f [Defendant] was caught selling drugs again he would be a career offender and subject to a substantial punishment." *Id.* Defendant's race, the Government asserts, "was never considered in the prosecution calculus." (*Id.; see also* Gov't's Supplemental Mem., Kinder Aff. and O'Regan Aff.; Gov't's Second Supplemental Mem. in Resp. to Tuitt's Motion for Disc. Concerning Selective Prosecution, ("Gov't's Second Supplemental Mem."), O'Neil Aff.)

The Government is correct insofar as it seeks to explain the exercise of its discretion from both the prosecutorial and law enforcement sides of the litigation. If, for example, the investigators and police authorities exercised discriminatory intent in Defendant's arrest and/or their referral to the United States Attorney's Office, his selective prosecution claim may be meritorious even without a showing of the prosecutor's intent when deciding to seek an indictment. Moreover, the explanation offered by the Government may well assist its defense against the charge of selective prosecution which Defendant may pursue. *See United States v. Graham,* 146 F.3d 6, 9 (1st Cir.1998) ("if the defendant alleges facts that tend to show that she has been selectively prosecuted and that raise a reasonable doubt about the propriety of the government's purpose, then she is entitled to an evidentiary hearing unless the government puts forth adequate countervailing reasons to refute the charge and … the court is persuaded that the hearing will not be fruitful") (citation and internal quotation marks omitted). However, the court believes that the Government's explanation, even if appropriately offered at this stage of the litigation, is inadequate given the evidence proffered by Defendant.

**H.**

At this juncture the court must acknowledge that, despite the distinction it draws between the initial effort to obtain discovery and the ultimate charge of selective prosecution, at least two appellate courts which have applied *Armstrong* appear to have collapsed the two inquiries. In turn, both courts refused to order discovery. Still, the court believes that both cases are distinguishable from the one at bar, particularly given the extensive information offered by the Government in both matters in response to the defendants' respective discovery motions.

In *United States v. Turner,* 104 F.3d 1180 (9th Cir.1997), the Ninth Circuit

Court of Appeals, having awaited the Supreme Court's decision in *Armstrong*, reversed a district court's order of discovery underlying a selective prosecution claim, concluding that the discovery request failed to meet the standards set by *Armstrong*. *Id.* at 1185–86. In coming to its conclusion, the court had before it extensive affidavits in which the prosecutor explained "federal prosecution policy." *Id.* at 1183. One affidavit described the Attorney General and FBI's "Safe Streets" Initiative, the implementation of that plan in Los Angeles, and the connection between street gang violence and illegal drug trafficking. *Id.* at 1182. The same affidavit explained the composition of law enforcement groups investigating violent street gangs. *Id.* Two other affidavits described the particular reasons for the arrests in the case before the court. *Id.* at 1183. In addition, an Assistant United States Attorney submitted an affidavit under seal containing the office's written guidelines regarding the prosecution of drug offenses. *Id.* The prosecution also submitted an updated report on the ethnic composition of its crack cocaine prosecutions. *Id.*

As the Ninth Circuit noted, "the government ha[s] not taken the posture attributed to it by the [district] court that it had no obligation to provide the information on which its prosecutions rested." *Id.* at 1185. Rather, the court explained, "[t]he government had provided precisely that information." *Id.* That information, which addressed the ultimate question regarding the exercise of prosecutorial discretion, made it even more difficult for the defendants to pass the preliminary threshold for discovery.

Similarly, in *Olvis, supra,* the Government provided two affidavits describing its decision to indict and offered testimony from an Assistant United States Attorney explaining the high percentage of indictments of blacks for the distribution of crack cocaine in the Norfolk–Newport News, Virginia, area, as well as testimony from a local police officer (who doubled as a special deputy with the FBI) describing the defendants' criminal activity and explaining why each white conspirator identified in the defendants' motion had not been indicted. *Id.,* 97 F.3d at 741–42. Given this information, the Fourth Circuit Court of Appeals concluded that the black defendants, who claimed that five unindicted whites were similarly situated and that more than 90% of those indicted in the federal division since 1992 for crack cocaine trafficking were black, had failed to carry their burden warranting discovery. *Id.* at 741, 746.

Again, the approach taken in both *Turner* and *Olvis* appears to collapse the issue of discovery into the ultimate question of selective prosecution. Perhaps, that is as it should be. As it developed in both *Turner* and *Olvis,* once a colorable claim of selective prosecution was raised, the Government saw fit to explain not only its prosecutorial policy, but the exercise of its discretion in the particular case. *Cf. United States v. Sepulveda,* 952 F.Supp. 94, 96 (D.R.I.1997) (noting that concerns about the exercise of prosecutorial discretion "are present not only in the context of what comprises a *prima facie* selective-prosecution claim, but rather permeate a selective-prosecution action from its inception"). Interestingly enough, the Government's responses appear to reflect the very approach taken by the Solicitor General in *Armstrong.* Although he resisted any concession that the evidence proffered there should result in further discovery, the Solicitor General acknowledged that certain evidence—much like the evidence proffered here—"would require the Government to say something in response." *United States v. Armstrong,* 1996 WL 88550, at *16 (U.S.Oral.Arg.1996).

The court believes that the affidavits offered by the Government in the instant matter do not overcome its obligation to provide a more complete response. Unlike the Government's responses in either *Turner* or *Olvis,* the Government's affidavits here, which attempt to justify Defendant's

particular prosecution, fail to identify a policy or practice which accounts for the federal prosecution of blacks only in the time period at issue, as contrasted to the state's contemporaneous prosecution of both blacks and whites for similar crimes. At best, the Government has offered evidence of Defendant's past criminal record as a factor in its decision to prosecute him. However, the Government has not described, nor has it offered to describe, its underlying prosecutorial policy, other than to say it was part of a focus by the Springfield Police on the Mason Square area. (*See* Gov't's Second Supplemental Mem., O'Neill Aff.) This stands in sharp contrast to the explanations offered by the Government in both *Turner* and *Olvis. See also Graham,* 146 F.3d at 9 (Government offered a list of eight factors in its decision not to indict bank in addition to defendant).

## I.

As it turns out, Defendant's first six requests are similar to the discovery voluntarily offered by the Government in *Turner:*

1. A list of all federal cases in which the defendant has been charged with a cocaine offense, specifying whether the charge involved cocaine base or cocaine powder;

2. the racial or ethnic identity of each defendant in the listed case.

3. A statement identifying (a) each of the law enforcement agencies, including joint federal-state-local task forces or other inter-Governmental organizations, involved in the selection of targets for investigation of cocaine powder or cocaine base criminal offenses, and (b) the policies followed in making that determination.

4. Statements identifying (a) the agencies involved and (b) the policies followed in determining which particular persons will be prosecuted in state or federal court.

5. A statement of the practices followed in implementing each policy articulated in response to requests 3(b) and 4(b) including articulable criteria employed in actual practice.

6. An explanation of how the decisions to investigate and prosecute Defendant Tuitt in the present case were made and how they were compliant with the policy and practices articulated in responses to requests 3 through 5.

(Def.'s Mot. for Disc. at 7–8.)[4] Although the Government may believe its proffered affidavits are sufficient, the court, for the

4. The four remaining requests, which concern racial breakdowns, are as follows:

7. A list of all white persons known to federal authorities, including the DEA and joint task forces, who were or are suspected of violating drug laws concerning cocaine and/or cocaine base, and a statement of when such person became a suspect, when each such White person was prosecuted, and if prosecuted when, where· and by what authority; and if not prosecuted, an explanation of why not, and when and by whom the decision not to prosecute was made. (Where necessary to protect the confidentiality of suspects, disclosure in the first instance to be made in camera, with the defendant to receive à redacted version.) With respect to each person, specify whether the drug involved was cocaine case, powder or both.

8. A list of all Hispanic persons known to federal authorities, including the DEA and joint task forces, who were or are suspected of violating drug laws concerning cocaine and/or cocaine base, and a statement of when such person became a suspect, when each such Hispanic person was prosecuted, and if prosecuted when, where and by what authority; and if not prosecuted, an explanation of why not, and when and by whom the decision not to prosecute was made. (Where necessary to protect the confidentiality of suspects, disclosure in the first instance can be made in camera, with the defendant to receive a redacted version.) With respect to each person, specify whether the drug involved was cocaine case, powder or both.

9. A list of all black persons known to federal authorities, including the DEA

reasons explained, does not. The evidence offered by Defendant suggests not only a discriminatory effect but—given the fact that no whites were prosecuted federally, although whites were prosecuted in the state courts—an inference of discriminatory intent.

In the court's estimation, the *prima facie* evidence presented by Defendant reflects possible choices on the part of law enforcement personnel, if not the prosecutors themselves, which raise an eyebrow high enough as to require a further explanation in the form of some of the discovery Defendant seeks. In this regard, the court believes that the first six requests made by Defendant should suffice to provide that explanation.

In ordering the Government to produce such discovery, the court is not finding that the prosecutors, on the one hand, or law enforcement agents, on the other, did in fact engage in selective prosecution. If anything, the court believes that it will be extremely difficult to prove that proposition. *See McAdams*, 73 Chi.–Kent L.Rev. at 615–616 (noting that "at the state and federal level, there is apparently only one published case [*People v. Ochoa*, 165 Cal. App.3d 885, 212 Cal.Rptr. 4 (1985) ] dismissing a criminal charge based on racially selective prosecution"). Rather, the court has determined only that more discovery is called for.

The court wishes to make three additional points. First, the Government's compliance with the court's order may well inform Defendant whether his claim of prosecutorial discretion is viable. *See* Drew S. Days III, *Race and the Federal Criminal Justice System: A Look at the Issue of Selective Prosecution*, 48 Maine L.Rev. 179, 184–89 (1996) (suggesting that nondiscriminating explanations account for disparities that appear initially to arise from racially selective decision-making by law enforcement officials). Second, a more complete explanation by the Government may make Defendant's efforts to obtain discovery more difficult. For example, once the Government in *Turner* admitted to an intentional focus on blacks and hispanics due largely to its concern with violent street gangs, thereby explaining the resulting racial disparity in its drug enforcement policy, the defendants were hard-pressed to counter the data. *Turner*, 104 F.3d at 1185. Third, the Government's response to this discovery order may well inform the court whether further discovery is even necessary. For the moment, however, and for all the reasons stated, Defendant matter deserves at least the discovery ordered.

### CONCLUSION

Defendant's Motion for Discovery is ALLOWED as follows: by October 1, 1999, the Government shall provide Defendant with the information sought in the first six paragraphs of Defendant's motion, quoted above, with respect to the western section of the district from January 1, 1996 through June 30, 1999. In all other respects, Defendant's motion is DENIED.

IT IS SO ORDERED.

and joint task forces, who were or are suspected of violating drug laws concerning cocaine and/or cocaine base, and a statement of when such person became suspect, when each such black person was prosecuted, and if prosecuted when, where and by what authority; and if not prosecuted, an explanation of why not, and when and by whom the decision not to prosecute was made. (Where necessary to protect the confidentiality of suspects, disclosure in the first instance can be made in camera, with the defendant to receive a redacted version.) With respect to each person, specify whether the drug involved was cocaine base, powder or both.

10. Identification and a brief description of all documents (including computer files) in which there is a compilation of data which includes the racial or ethnic characteristics of persons suspected, investigated, prosecuted, and/or convicted of violating drug laws.

(Def.'s Mot. for Disc. at 8–9.)